GEORGIA INDUSTRIAL
GROUP, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

South Georgia Natural Gas Company,
et al., Intervenors.

Nos. 93–1705, 94–1056 and 94–1272.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 7, 1998.

Decided March 17, 1998.

Edward J. Grenier, Jr., Washington, DC, argued the cause for petitioner, with whom Gail S. Gilman was on the briefs.

Susan J. Court, Special Counsel, Federal Energy Regulatory Commission, argued the cause for respondent, with whom Jay L. Witkin, Solicitor, Washington, DC, John H. Conway, Deputy Solicitor, and Joel M. Cockrell, Attorney, Washington, DC, were on the brief.

Before: GINSBURG, RANDOLPH and ROGERS, Circuit Judges.

1. The Georgia Industrial Group is an association of Georgia and Alabama industrial users of natural gas obtained or transported through the South Georgia Natural Gas Company pipelines.

2. *South Georgia Natural Gas Co.,* 63 F.E.R.C. ¶ 61,190 (1993) ("First Order"), *reh'g granted and denied,* 64 F.E.R.C. ¶ 61,251 (1993) ("Second Order"), *reh'g granted and denied,* 65 F.E.R.C. ¶ 61,-265 (1993) ("Third Order"), *reh'g denied,* 66 F.E.R.C. ¶ 61,112 (1994) ("Fourth Order").

3. South Georgia operates an 831 mile gas pipeline that extends from a single receipt point at its interconnection with Southern Natural Gas Company in Alabama to 68 delivery points in Georgia and Florida. *See* First Order, 63 F.E.R.C. ¶ 61,-190 at 62,420. Prior to Order No. 636, South Georgia became a transportation-only pipeline on May 5, 1992, following customer conversions from firm sales to firm transportation. *See id.*

ROGERS, Circuit Judge:

The Georgia Industrial Group ("GIG")[1] petitions for review of four orders of the Federal Energy Regulatory Commission ("Commission")[2] that approve tariff revisions filed by the South Georgia Natural Gas Company ("South Georgia")[3] to implement Order No. 636.[4] The revisions added a pre-granted abandonment requirement and a right-of-first-refusal mechanism setting the conditions under which South Georgia's firm transportation customers could continue to receive service after their contracts expire. South Georgia also sought to retain its pre-Order No. 636 capacity allocation and service priority plan for interruptible transportation customers. GIG principally contends that the Commission acted in an unduly discriminatory manner in approving revised tariffs that treat similarly situated customers differently by permanently exempting former firm sales customers from pre-granted abandonment requirements and subjecting non-exempted customers to the onerous right-of-first-refusal mechanism. GIG further contends that South Georgia's method for allocating interruptible capacity, its so-called "no-bump" rule, has become unjust and unreasonable in post-Order No. 636 circumstances. To the extent GIG challenges the fairness of the right-of-first-refusal mechanism in light of the exemption from pre-granted abandonment requirements for some long-term firm transportation shippers, the petition is a collateral attack on Order No. 636, and we dismiss that part of the petition.

It provides both firm transportation service and interruptible transportation service to its customers. *See id.*

4. Order No. 636, *Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations, and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol,* F.E.R.C. Stats. & Regs. ¶ 30,939 (1992), *order on reh'g,* Order No. 636–A, F.E.R.C. Stats. & Regs. ¶ 30,950 (1992); *order on reh'g,* Order No. 636–B, 61 F.E.R.C. ¶ 61,272 (1992); *aff'd in part, rev'd in part, United Distrib. Cos. v. FERC,* 88 F.3d 1105 (D.C.Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1723, 137 L.Ed.2d 845 (1997); *on remand,* Order No. 636–C, 78 F.E.R.C. ¶ 61,186 (1997).

Insofar as GIG requests a waiver of pre-granted abandonment regulations, it fails to explain why the South Georgia pipeline is so unusual that the Commission should be required to grant a waiver. Finally, because the Commission chose between two reasonable options for allocating interruptible capacity—a monthly no-bump rule and a permanent no-bump rule—and GIG fails to present persuasive reasons to conclude that the Commission's choice was arbitrary and capricious, we deny the remaining portions of the petition.

## I.

Beginning in 1978, following enactment of the Natural Gas Policy Act,[5] the Commission began to restructure its regulations to enable the market to play a greater role in determining the supply, demand, and price of natural gas. *See Conoco Inc. v. FERC,* 90 F.3d 536, 539–40 (D.C.Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1017, 136 L.Ed.2d 893 (1997); *United Distrib. Cos. v. FERC,* 88 F.3d 1105, 1122–23 (D.C.Cir.1996). As part of this restructuring, on April 16, 1992, the Commission issued Order No. 636, which was designed "to ensure that all shippers have meaningful access to the pipeline transportation grid so that willing buyers and sellers can meet in a competitive, national market to transact the most efficient deals possible." Order No. 636, F.E.R.C. Stats. & Regs. ¶ 30,-939 at 30,393. To achieve this goal, the Commission required interstate pipelines to restructure their services to separate the

transportation of gas from the sale of gas, to change the design of their transportation rates, and to take other actions to promote a free market in gas transportation. *See* Order No. 636–C, 78 F.E.R.C. ¶ 61,186 at 61,-766.

On December 1, 1992, South Georgia submitted a compliance filing of revised tariffs, providing, as relevant here, for a "pre-granted abandonment" requirement under which firm transportation service[6] of one year or more ends automatically at the end of a service agreement. *See* First Order, 63 F.E.R.C. ¶ 61,190 at 62,431. The filing expressly exempted customers who converted from sales to firm transportation service after February 13, 1991, and before May 18, 1992, from this requirement.[7] *See id.* The filing also provided for a right-of-first-refusal mechanism to allow firm transportation customers whose service would stop due to the pre-granted abandonment requirement an opportunity to continue to receive service.[8] *See id.* The filing further provided for allocation of interruptible transportation service whereby South Georgia would deliver service on a first-come, first-served basis according to a queue: if a customer significantly changed its initial order for gas, it would lose its place in the queue, and a customer could not increase the volume of gas in its order if to do so would decrease the amount of gas already on order by another customer (the "no-bump" rule), while a customer would be required to pay scheduling penalties[9] for

---

**5.** Pub.L. No. 95–621, 92 Stat. 3350 (1978) (codified as amended at 15 U.S.C. §§ 3301–3432 (1994)).

**6.** "Firm" transportation service is guaranteed, while "interruptible" transportation service is not.

**7.** "Pre-grant of abandonment" is authorized by the Commission under 18 C.F.R. § 284.221(d)(1) (1997). Under 18 C.F.R. § 284.221(d)(3), however, pre-grant of abandonment is not permitted for customers who converted from sales to firm transportation service after February 13, 1991, and before May 18, 1992.

**8.** Under 18 C.F.R. § 284.221(d)(2), tariffs must include a right-of-first-refusal mechanism whereby a customer with a firm transportation contract for a year or longer may avoid pre-granted abandonment of service at the expiration of the

contract or other Commission-authorized arrangement by (1) giving the pipeline timely notice that it will match the longest term and the highest rate for firm service (limited to the maximum rate permitted by the Commission) offered by any other person, and (2) executing such a matching contract.

**9.** The scheduling penalties in this filing greatly exceeded the penalties in effect prior to the filing. Over four Commission proceedings, GIG and others protested the fairness of these penalties, and the Commission ordered South Georgia to alter them in various ways. *See* First Order, 63 F.E.R.C. ¶ 61,190 at 62,426–28; Second Order, 64 F.E.R.C. ¶ 61,251 at 62,764–66; Third Order, 65 F.E.R.C. ¶ 61,265 at 62,239–42; Fourth Order, 66 F.E.R.C. ¶ 61,112 at 61,184–86. Ultimately, South Georgia provided for two scheduling penalties. First, a customer must pay

shipping more or less gas than it ordered. *See id.* at 62,424–26.

GIG objected to South Georgia's filings on two grounds. First, GIG claimed that the pre-granted abandonment requirement, subject to the right-of-first-refusal mechanism, unduly discriminates against customers who are not exempted from it. *See* First Order, 63 F.E.R.C. ¶ 61,190 at 62,431. Second, GIG complained that the "no-bump" rule could prevent a customer with a preferable queue position from increasing its volume of gas shipped and could prevent a customer who had previously reduced its daily orders for the purpose of avoiding scheduling penalties from restoring its daily orders to previous levels. *See id.* at 62,425. We describe the Commission's proceedings relating to these two issues in turn.

The Commission's consideration of GIG's challenge to the pre-granted abandonment requirement spanned two proceedings. In the First Order, the Commission dismissed GIG's concern about undue discrimination, observing that customers not exempted from pre-granted abandonment could protect themselves from loss of service at the end of a service agreement by negotiating an "evergreen" or "roll-over" clause [10] into their service agreements. *See* First Order, 63 F.E.R.C. ¶ 61,190 at 62,432. In the Second Order, in response to GIG's assertion that the pre-granted abandonment requirement was unduly discriminatory because only a small minority of South Georgia's firm transportation customers were subject to it,[11] the Commission observed that in addition to being protected by the right to negotiate evergreen or rollover clauses, non-exempted customers were also protected from automatic cessation of service by the right-of-first-refusal mechanism, "which permit[s] a continuation of service as long as the [customer] is willing to pay the maximum rate [permitted by the Commission] and match the contractual term of a competing offer." Second Order, 64 F.E.R.C. ¶ 61,251 at 62,769.

The Commission's consideration of GIG's protest to the no-bump rule spanned four proceedings, during which the Commission vacillated in its approach. Initially, the Commission ruled that GIG's complaints had already been addressed within South Georgia's filings. *See* First Order, 63 F.E.R.C. ¶ 61,190 at 62,426. But this conclusion was based on the Commission's misinterpretation of a longstanding South Georgia tariff provision that historically had permitted customers to prearrange a reduction in their orders without loss of queue position for such rare occurrences as facilities maintenance; the Commission misinterpreted this provision to mean that on any day, a customer could

---

a penalty of $0.1681 per million British thermal units ("MMBtu") for takes in excess of the greater of 50 MMBtu or 10% of daily orders at each delivery point. *See* First Order, 63 F.E.R.C. ¶ 61,190 at 62,426–28; Second Order, 64 F.E.R.C. ¶ 61,251 at 62,765. This penalty is the same as prior penalties. *See* First Order, 63 F.E.R.C. ¶ 61,190 at 62,426–28. Second, a customer must pay a penalty of $0.1681 per MMBtu for volumes shipped that are less than 95% of the daily orders at each delivery point. *See* Second Order, 64 F.E.R.C. ¶ 61,251 at 62,764–66. This penalty is new. *See* First Order, 63 F.E.R.C. ¶ 61,190 at 62,427–28. For both scheduling penalties, where the scheduling variance "causes extreme harm to the system," the customer must pay a penalty of $10 per MMBtu for the relevant variance—more than 59 times the regular penalty rate. Second Order, 64 F.E.R.C. ¶ 61,251 at 62,765. This super-penalty also is new. *See* First Order, 63 F.E.R.C. ¶ 61,190 at 62,426–28. Without providing evidence in the record, GIG contends and the Commission does not dispute that the super-penalty is the norm because the pipeline is usually at capacity, resulting in signif-

icant increases in penalties over those in effect prior to these proceedings. GIG does not appeal the reasonableness of the penalties themselves, however, only noting their allegedly unreasonable effect in conjunction with South Georgia's no-bump rule.

10. The Commission permits a pipeline and customer to negotiate an "evergreen" or "roll-over" clause into their service agreement to allow them to extend the agreement prior to its termination and thus avoid automatic termination pursuant to pre-granted abandonment regulations. *See* Order No. 636–A, F.E.R.C. Stats. & Regs. ¶ 30,950 at 30,627–28; *see also United Distrib. Cos.,* 88 F.3d at 1139.

11. Most of South Georgia's current firm transportation service customers converted to firm transportation service from sales service after February 13, 1991, and before May 18, 1992, and thus only a small minority are not exempted from automatic termination under the pre-granted abandonment mechanism. *See* Second Order, 64 F.E.R.C. ¶ 61,251 at 62,769.

decrease its orders to avoid scheduling penalties but would still maintain its queue position. *See id.* As GIG's complaint was that customers would not be able to do just that, the Commission ruled that GIG's complaint was resolved. *See id.* Following South Georgia's protests that this longstanding tariff provision was meant to apply only in narrow circumstances, and not to customers wishing to decrease their orders to avoid scheduling penalties, the Commission reversed itself in the Second Order and adopted South Georgia's interpretation of the provision, reasoning that its previous interpretation of South Georgia's tariff would lead to "gamesmanship" that would harm South Georgia and its customers with less preferable queue positions. *See* Second Order, 64 F.E.R.C. ¶ 61,251 at 62,762.

Also in its Second Order, however, the Commission interpreted a different South Georgia tariff provision as meaning South Georgia intended the no-bump rule to operate on a monthly basis, whereby at the beginning of the month customers with preferable queue positions could increase the volume of their orders of gas, even if doing so would "bump" (decrease) the volume of gas available to customers with less preferable queue positions. *See id.* at 62,763. The Commission approved this monthly basis because it would "narrow the application of the no-bump rule and [would] avoid unfairness to high-queue-position [interruptible transportation customers] while maintaining system stability." *Id.* This Commission interpretation was consistent with GIG's request and addressed its concerns because it meant that customers with preferred (*i.e.,* high) queue positions could bump those with less preferred queue positions at the beginning of each month. *See* Third Order, 65 F.E.R.C. ¶ 61,265 at 62,237. South Georgia protested, explaining that the purpose of the no-bump rule was to protect customers who consistently shipped a steady volume of gas, at the expense of those who varied the volumes they shipped through the pipeline. *See id.* According to South Georgia, removing this protection would discourage long-term contracts for steady volumes and could reduce the amount of gas South Georgia is able to ship through its system overall, thus hurting its business.[12] *See id.* Once again the Commission reversed itself, this time explaining that South Georgia had not intended its no-bump rule to operate on a monthly basis, adopting South Georgia's rationale as its own, and declaring South Georgia's no-bump rule, as outlined in its original filing, to be reasonable. *See id.* at 62,238. The Commission acknowledged that GIG's preferred monthly no-bump rule was also reasonable, but concluded that there was no good reason to reject South Georgia's proposal in favor of GIG's. *See id.*

GIG sought rehearing of the Third Order, again requesting that the Commission direct South Georgia to establish a monthly no-bump rule. *See* Fourth Order, 66 F.E.R.C. ¶ 61,112 at 61,184. For the first time, GIG argued that because capacity on the South Georgia pipeline was constrained, the approved no-bump rule created a Hobson's choice for interruptible transportation customers, forcing them either to pay high penalties or to lose preferred queue positions. *See id.* GIG maintained that this situation was fundamentally unfair and that a monthly no-bump rule was more reasonable than that approved by the Commission. The Commission disagreed, maintaining that the "use-or-lose" feature of the approved no-bump rule was not unreasonable and that if GIG and similarly situated customers were concerned about reserving capacity, they could avoid scheduling penalties by requesting firm transportation capacity and paying a reservation charge or by seeking to obtain released firm transportation capacity on a short-term basis from a firm transportation service customer. *See id.*

GIG timely petitioned for review of all four Commission orders. GIG contends that

---

**12.** Essentially, South Georgia argued that its business is best served by discriminating in favor of long-term, steady volume customers at the expense of variable volume customers; the former either ship a steady volume of gas or pay a scheduling penalty, and in return are guaranteed their queue position and their desired volume of gas, while the latter avoid scheduling penalties by scheduling only the volume of gas that they need but face loss of preferred queue positions and may not always increase the volume of gas they ship as they might like.

South Georgia's pre-granted abandonment requirement unduly discriminates, within the meaning of 15 U.S.C. §§ 717c(b), 717d(a) (1994), against all customers not subject to its exemption. GIG points to the facts that only a small minority of customers are not exempted from the pre-granted abandonment requirement and that these customers must "go through cumbersome, risky, potentially expensive [right-of-first-refusal] procedures." *See supra* note 11. Treating two sets of similarly situated customers differently in this way is *per se* unduly discriminatory, GIG maintains, and the discriminatory impact is exacerbated because capacity on South Georgia's system is constrained. GIG also contends that the Commission did not offer a justification for such disparate treatment. With regard to the no-bump rule, GIG contends that the Commission failed to provide an adequate explanation for its numerous reversals of its position and failed to address significant arguments, including that: (1) the new scheduling penalties, *see supra* note 9, combined with the no-bump rule provide an incentive for South Georgia to unjustly enrich itself by frustrating variable customers' efforts to receive service, and (2) whereas, prior to 1992, the South Georgia system was rarely at capacity, and thus variable customers were generally able to increase or decrease volumes shipped, at present variable customers cannot do so because capacity is not always available.

## II.

■ Initially, the Commission contends, and we agree, that GIG's challenge to South Georgia's pre-granted abandonment requirement is an impermissible collateral attack on Order No. 636, on which the 60–day time limit for challenges provided in 15 U.S.C. § 717r(b) (1994) has long since expired. *See Transwestern Pipeline Co. v. FERC*, 988 F.2d 169, 174 (D.C.Cir.1993); *cf. ANR Pipeline Co. v. FERC*, 71 F.3d 897, 900–01 (D.C.Cir.1995); *American Gas Ass'n v. FERC*, 912 F.2d 1496, 1514–15 (D.C.Cir. 1990). Order No. 636 exempts from pre-granted abandonment requirements those

customers who converted from sales to firm transportation service after February 13, 1991, and before May 18, 1992. *See* Order No. 636, F.E.R.C. Stats. & Regs. ¶ 30,939 at 30,636; 18 C.F.R. § 284.221(d)(3). The Commission explained that it approved South Georgia's revised tariffs because they implemented the pre-granted abandonment requirement and the right-of-first-refusal mechanism required by Order No. 636, *see* Second Order, 64 F.E.R.C. ¶ 61,251 at 62,769, an assessment GIG does not dispute. GIG's complaint, that the pre-granted abandonment requirement subjects a minority of customers to riskier and costlier procedures for preserving their service while treating similarly situated customers differently, was considered during the Order No. 636 proceedings. In response to a challenge that under Order No. 636 firms not exempted from pre-granted abandonment would encounter greater difficulty and cost in maintaining service at the end of a contract, the Commission concluded that the exemption is not discriminatory because parties have the right to defer pre-granted abandonment by either negotiating a roll-over clause into their contracts or utilizing their guaranteed right-of-first-refusal. *See* Order No. 636, F.E.R.C. Stats. & Regs. ¶ 30,939 at 30,452. Further, during the Order No. 636–A proceedings, the Commission concluded that there was no reason to expand the exemption from pre-granted abandonment to cover all converted firm sales customers. *See* Order No. 636–A, ¶ 30,950 at 30,635–36. The court, in turn, concluded that while "roll-over" clauses would not alone suffice to protect customers' ability to renew their service contracts, the "mandatory right-of-first-refusal mechanism ... provides substantially more protection to existing customers" and the complaint procedure [13] provides back-up protection. *United Distrib. Cos.*, 88 F.3d at 1139–40 & n. 42. Thus, the court affirmed pre-granted abandonment requirements including the exemption, subject to one remanded issue not relevant here, because the combination of roll-over clauses, the right-of-first-refusal mechanism, and the complaint procedure adequately guaranteed that customers would be able

---

**13.** The Commission provides a complaint mechanism to remedy an unjustified loss of service.

*See* 18 C.F.R. § 385.206 (1997); *United Distrib. Cos.*, 88 F.3d at 1139 n. 42.

to extend service at the end of their contracts. *See id.* at 1138–41. Consequently, to the extent that GIG contends that South Georgia's pre-granted abandonment requirement is inherently discriminatory for treating like customers differently, or that the risks and costs placed on non-exempt customers are unduly burdensome, its challenge is a collateral attack on Order No. 636, and the court lacks jurisdiction to consider it now.

As to GIG's request for a waiver due to special factors, the only question is whether the Commission's refusal to grant a waiver was based on reasoned and principled decisionmaking supported by the record. *See Pennsylvania Office of Consumer Advocate v. FERC,* 131 F.3d 182, 185–86 (D.C.Cir. 1997) (citing *Western Resources, Inc. v. FERC,* 9 F.3d 1568, 1572 (D.C.Cir.1993)). GIG contends that the Commission should have waived its pre-granted abandonment requirement because, in the unique context of South Georgia's system, this requirement creates undue discrimination not present in other pipelines. The only unique factors GIG identifies, however, are the small percentage of customers subject to the pre-granted abandonment requirement and the capacity constraint of South Georgia's system. GIG contends that because South Georgia is the only pipeline on which all of the pipeline's local distribution customers converted from sales service to firm transportation service during the exemption period designated in Order No. 636, *see supra* note 11, the amount of capacity now held by non-exempt customers is small, and because the system is at capacity, the pipeline has greater monopoly power in contract renewal negotiations to hold out for maximum terms and high rates. GIG's contention is unpersuasive, however, for several reasons. First, because the maximum contract term is five years, *see* Order No. 636–C, 78 F.E.R.C. ¶ 61,186 at 61,774, and the maximum rates allowable are those set by the Commission, which must be just and reasonable, *see* 15 U.S.C. § 717c(a), the worst that non-exempt members can expect in contract negotiations is to face a five year term at a just and reasonable rate. GIG makes no plausible argument that this situation is particularly

bleak. Second, although GIG asserts that South Georgia is the only pipeline whose customers all converted from sales to firm transportation service between February 13, 1991, and May 18, 1992, GIG offers no evidence that other pipelines are not similarly capacity-constrained, or that customers of other pipelines subject to a right-of-first-refusal mechanism negotiate shorter terms and lower rates significantly more often than South Georgia's customers. In short, while its argument has facial appeal, GIG fails to support it with any hard data on actual impact or an adequate explanation of why the South Georgia pipeline is unusual compared to other pipelines such that the Commission should be required to grant a waiver. Therefore, the Commission's approval of South Georgia's compliance filings was not unreasonable.

### III.

GIG's contentions regarding the no-bump rule fare no better. At issue is whether it was unreasonable, or arbitrary and capricious, for the Commission to allow South Georgia to continue its historic practice of rewarding steady volume interruptible customers at the expense of variable volume customers. *See Pennsylvania Office of Consumer Advocate,* 131 F.3d at 185–86. Where the Commission chooses among reasonable alternatives, the court defers to the Commission's selection so long as its decision is reasonable and consistent with the intent of the statutes it is implementing. *See United Distrib. Cos.,* 88 F.3d at 1166. Where the Commission vacillates in its reasoning, the court's role is to ensure that it has justified its ultimate decision and responded to substantial arguments raised by petitioners. *See Williams Natural Gas Co. v. FERC,* 3 F.3d 1544, 1550–51 (D.C.Cir.1993); *K N Energy, Inc. v. FERC,* 968 F.2d 1295, 1303–04 (D.C.Cir.1992).

While GIG correctly notes that the Commission vacillated regarding the no-bump rule, we disagree with its contention that the Commission failed to justify its ultimate decision. First, the Commission accepted as its own South Georgia's reasoning that the pipe-

line would lose interruptible transportation service if it could not guarantee capacity to customers willing to maintain steady volumes. *See* Third Order, 65 F.E.R.C. ¶ 61,-265 at 62,237–38. Second, the Commission explained that there is nothing improper in making an initial allocation of interruptible capacity on a first-come, first-served basis but requiring a customer to maintain its volume in order to preserve its place in the queue. *See id.* at 62,238. This mechanism is reasonable, the Commission explained, because it gives an advantage to customers with preferred queue positions in the initial allocation of capacity and in allocation of additional capacity that comes available, while preventing customers with less preferable queue positions from losing their capacity to those with better queue positions and thus enabling lower queue customers to maintain steady volumes of gas and encouraging them to continue contracting with South Georgia. *See id.* Moreover, the Commission reasoned, a customer seeking additional capacity has the option of requesting firm transportation capacity and paying the associated reservation charge, or obtaining released firm transportation capacity on a short-term basis from a firm shipper. *See* Fourth Order, 66 F.E.R.C. ¶ 61,112 at 61,184. For these reasons, the Commission determined that "[r]equiring [interruptible transportation customers] to use, or lose, their capacity is not unreasonable." *Id.* Although the Commission also found that the monthly no-bump rule proposed by GIG was reasonable, it concluded that the choice between South Georgia's proposal and GIG's amounted to a policy decision as to which customers ought to receive a preference when the system is at capacity, and there was no reason to reject South Georgia's choice in the matter. *See* Third Order, 65 F.E.R.C. ¶ 61,265 at 62,238. So viewed, the Commission adequately explained its ultimate conclusion.

As to GIG's complaint that the Commission failed to address substantive concerns presented to it, we find it no more persuasive. Contrary to GIG's position that the Commission did not address its concerns regarding the newly developed capacity constraints on the system, the Commission makes clear that its analysis is premised on the assumption that the system is at capacity, for when it is not, the no-bump rules do not constrain variable customers. *See* Third Order, 65 F.E.R.C. ¶ 61,265 at 62,238. It reasons that when the system is at capacity, some customers will be unable to ship maximally desired volumes; in determining which customers will be constrained, South Georgia's mechanism is as reasonable as GIG's. *See id.* South Georgia's proposal requires high-queue shippers either to use or to lose their service, and makes clear that although high-queue shippers are preferred in initial allocation and when additional capacity becomes available, such shippers are not guaranteed "the right to capacity at the expense of lower queue positioned shippers that desire to continue their flows of gas under the IT service." *Id.* The balance the Commission chose is clearly not an unreasonable one.

Also, contrary to GIG's contention that the Commission failed to consider the fact that the new scheduling penalties provided an opportunity for South Georgia to reap substantial profits while purposefully frustrating the ability of variable volume customers to receive service, *see supra* note 9, the Commission made clear that it did consider the impact of the new scheduling penalties when it explained how variable customers could avoid paying the penalties. *See* Fourth Order, 66 F.E.R.C. ¶ 61,112 at 61,184. In addition, the Commission noted that GIG could file a complaint under section 5 of the Natural Gas Act, 15 U.S.C. § 717d, when it believes the pipeline is abusing its discretion or acting unreasonably. *See* Fourth Order, 66 F.E.R.C. ¶ 61,112 at 61,186.[14]

Accordingly, we dismiss the petition insofar as it collaterally attacks Order No. 636 with respect to the Commission's approval of South Georgia's pre-granted abandonment requirements, subject to the right-of-first-

14. While GIG contends that the Commission failed to address the fact that the first-come, first-served rule had been in South Georgia's tariffs since 1987, it fails to explain why this fact should alter the Commission's conclusions. Further-more, while GIG contends that the Commission also failed to address unclear tariff language, the Commission's ultimate interpretation of the tariffs is sufficient. *See* Fourth Order, 66 F.E.R.C. ¶ 61,112 at 61,185–86.

refusal mechanism, and deny the petition with respect to the Commission's refusal to waive its pre-granted abandonment requirement or modify South Georgia's historic no-bump tariff provision.