# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 3, 2010          Decided February 11, 2011

No. 09-1306

DYNEGY MIDWEST GENERATION, INC,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

FIRSTENERGY SOLUTIONS CORP., ET AL.,
INTERVENORS

———

Consolidated with 09-1308

———

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

———

*James K. Mitchell* and *Ashley C. Parrish* argued the cause for petitioners.  With them on the briefs was *Neil L. Levy*.  *A. Karen Hill* and *Michael J. Rustum* entered appearances.

*Lona T. Perry*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent.  With her on the brief were *Thomas R. Sheets*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Jeffrey G. DiSciullo*, *Wendy N. Reed*, and *David S. Berman* were on the brief for intervenors Midwest ISO Transmission Owners in support of respondent.

Before: SENTELLE, *Chief Judge*, BROWN, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: The petitioners own and operate power generation facilities that are part of the Midwest Independent System Operator ("ISO"), a regional transmission organization. The generators supply two kinds of power: (1) "real power" of the sort we are all familiar with and use for running motors, lighting lamps, etc.; and (2) "reactive power," a support service used to maintain adequate voltages to transmit real power, and to prevent damage such as overheating of generators and motors. See FERC STAFF REPORT, AD05-1-000, PRINCIPLES FOR EFFICIENT AND RELIABLE REACTIVE POWER SUPPLY AND CONSUMPTION 17-20 (2005), available at http://www.ferc.gov/eventcalendar/files/20050310144430-02-04-05-reactive-power.pdf. Inadequacies in reactive power can cause voltage collapse and blackouts. *Id*. at 20. Real power is sold to regular customers; reactive power is sold to the Midwest ISO and the cost passed on to transmission owners and operators. Midwest ISO Open Access Transmission and Energy Markets Tariff, Schedule 2, III. A & C.

Before the orders in dispute here, generators within the Midwest ISO were compensated for all reactive power with cost-based rates, pursuant to Schedule 2 of the ISO's tariff. In the challenged orders, FERC accepted a tariff amendment under which any transmission owner could elect an alternative rule of compensation, Schedule 2-A. Under that schedule, the

transmission owner would provide no compensation for reactive power produced within a specified range (the so-called "deadband"[1]). (Transmission owners electing Schedule 2-A would continue to pay for reactive power outside the deadband, though on a basis somewhat different from that of Schedule 2.) A transmission owner's election between the two schedules would govern its compensation of all generators in its zone (and, in case of a multi-zone transmission owner, all its zones), affiliated and unaffiliated generators alike.

The petitioners challenge the orders. Their primary contention is that allowance of the Schedule 2-A option was unduly discriminatory, as it would cause generators in different zones to be compensated differently, entirely at the untrammeled choice of each zone's transmission owners, even though Midwest ISO generators compete with each other across zonal borders. Second, they contend that transmission owners were not authorized to file the new tariff under § 205 of the Federal Power Act ("FPA"), 16 U.S.C. § 824d. We grant the petitions for review on the first objection but reject the second.

* * *

Historically, vertically integrated utilities could recover the costs for providing both real and reactive power through a single rate charged to customers. In 1996, FERC required utilities to functionally unbundle their generation and

---

[1] The "deadband" is a range between a 0.95 "leading" power factor (reflecting the real/reactive ratio when the generator is consuming reactive power) and a 0.95 "lagging" power factor (reflecting the real/reactive ratio when the generator is supplying reactive power). Commission Br. 4-5.

transmission functions and to provide access to their transmission grid to customers on a non-discriminatory basis. See *Promoting Wholesale Competition Through Open-Access Non-Discriminatory Transmission Services by Public Utilities*, Order No. 888, 61 Fed. Reg. 21,540 (May 10, 1996). The Commission ordered public utilities to offer ancillary services necessary for a reliable system (including reactive power supply), required transmission customers to purchase those services, *id*. at 21,580–82, and ordered that the rates paid to generators for reactive power be cost-based, *id*. at 21,590.

In two orders issued in 2003 and 2004, the Commission created the opportunity for transmission owners to select among alternative bases of compensation. First it found that, as a general matter, a generator should not be compensated for providing reactive power within a specified range, the deadband, "since it is only meeting its obligation [to do so]." See *Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, 68 Fed. Reg. 49,846 at 49,891 (P 546) (Aug. 19, 2003) ("Order No. 2003"). But the Commission allowed ISOs and Regional Transmission Organizations to deviate from this principle. *Id*. at 49,891 (P 548). On rehearing it made clear that if a transmission owner continued to pay its own or affiliated generators for reactive power service, the principle of "comparability" would require it to pay unaffiliated generators similarly. See *Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003-A, 69 Fed. Reg. 15,932 at 15,964 (P 416) (Mar. 26, 2004) ("Order No. 2003-A").

The Midwest ISO is a regional transmission organization to which many of the public utilities in the Midwest transferred operational control over their transmission facilities. *Midwest Independent Transmission System Operator, Inc.*, 97 FERC ¶ 61,326 (2001). It has designated

certain transmission pricing zones within its footprint which generally correspond to the boundaries of the transmission facilities of each participating transmission owner. *Midwest ISO Transmission Owners*, 122 FERC ¶ 61,305, P 1 & n.4 (2008) ("Initial Order"). Transmission rates in different transmission zones may vary, but for a sale to any purchaser throughout the Midwest ISO, the transmission rate will be simply the price for the purchaser's zone. *Id*.; *Midwest ISO*, 84 FERC ¶ 61,231 at 62,166 (1998) (explaining that the single rate is "based on the costs of the local service area where the point of delivery is located").

In October 2007, certain transmission owners in the Midwest ISO proposed a change in the ISO's tariff that in effect exercised the option they believed had been created by Orders Nos. 2003 and 2003-A. Each transmission owner (or all transmission owners in a zone in the case of such multiple owners) could choose between Schedule 2 (cost-based compensation for all reactive power) and Schedule 2-A (no compensation for reactive power in the deadband, and somewhat different compensation for reactive power outside). Initial Order, P 1. FERC rejected a claim—raised only secondarily before us—that even if transmission owners in each zone compensated all the generators in their zone, affiliated and unaffiliated, on a comparable basis, granting transmission owners the right to choose would violate the comparability requirement developed in Orders Nos. 2003 and 2003-A. *Midwest ISO Transmission Owners*, 129 FERC ¶ 61,041, P 78 (2009) ("Rehearing Order"). It paid virtually no attention to petitioners' independent argument that its order allowed undue discrimination in violation of § 205(b) of the FPA, see, e.g., Request for Rehearing of Exelon Corporation at 5-12, treating it as merely a claim that some generators might be economically disadvantaged. See Rehearing Order, PP 91-97.

The petitioners object that comparability and absence of undue discrimination are not synonymous, and urge us to declare FERC's orders to be in violation of § 205(b)'s anti-discrimination provision, as well as arbitrary and capricious and unsupported by substantial evidence. 5 U.S.C. § 706(2)(A), (E). They also argue that the filing of the tariff was (quite apart from FERC's acceptance of it) without legal foundation.

* * *

*Undue discrimination.* Before reaching the merits of the petitioners' discrimination claim, we must consider FERC's objection that the petitioners' challenge to Schedule 2-A was an impermissible collateral attack on the rule of comparability for reactive power tariffs as developed in Orders Nos. 2003 and 2003-A—essentially an assertion that this court lacks jurisdiction to hear the discrimination claim. FPA § 313(b), 16 U.S.C. § 825*l*(b) (giving this court jurisdiction only if an aggrieved party files a petition with the court within 60 days of the issuance of the order). FERC contends that petitioners failed to file a timely challenge to Orders Nos. 2003 and 2003-A, which it now views as establishing the proposition that where "comparability" as defined in those orders is present, there can be no undue discrimination.

Under § 313(b) the 60-day clock starts running only when "the agency has decided a question in a manner that reasonably puts aggrieved parties on notice of the rule's content." *Southern Company Services, Inc. v. FERC*, 416 F.3d 39, 44–45 (D.C. Cir. 2005) (citing *RCA Global Communications, Inc. v. FCC*, 758 F.2d 722, 730 (D.C. Cir. 1985)). A petition is a "collateral attack only if a reasonable firm in [petitioners'] position would have perceived a very

substantial risk that the [order] meant what the Commission now says it meant." *Id*. at 45 (internal quotations omitted).

Those criteria are not satisfied here. In its Rehearing Order, FERC acknowledged that,

> prior to this case, the Commission has never evaluated a proposed tariff provision that allows all generators within a particular zone in an RTO—affiliated and unaffiliated—to collect reactive power compensation on one basis, while all generators in a different zone in the same RTO collect reactive power compensation on a different basis.

Rehearing Order, P 71.

Moreover, if Orders Nos. 2003 and 2003-A made it clear that satisfaction of the comparability requirement within each zone inherently and automatically meant satisfaction of the FPA's anti-discrimination provisions, one would have expected the Commission to offer us some snippet from the orders advancing that idea. It offers no such thing.

When FERC itself has acknowledged that the issue it was considering was new, and can point to no words expressing the supposedly governing principle, we cannot conclude that a reasonable petitioner would have perceived a "very substantial risk" that Orders Nos. 2003 and 2003-A meant what FERC now says they mean. *Southern Company Services, Inc*., 416 F.3d at 45. Thus petitioners are not mounting a collateral attack on Orders Nos. 2003 and 2003-A, and, equivalently, § 313(b) is no bar to our jurisdiction.

We now turn to the merits of the discrimination claim. Its gist is that a compensation regime that allows transmission owners to choose whether or not to compensate generators for providing reactive power within the deadband will create

arbitrary differences in the competitive position of generators in different zones, and is thus unduly discriminatory under § 205(b) of the FPA.

It is not altogether clear that the Commission understood petitioners' discrimination complaint. It insisted that so long as the proposed Schedule 2-A requires transmission owners to treat affiliated and unaffiliated generators comparably, as required by Orders Nos. 2003 and 2003-A, resulting zonal variations in compensation would not be unduly discriminatory. It analogized zonal reactive power compensation to zonal transmission rates and concluded that there was no discrimination because "customers are obligated to pay only one zonal rate." Rehearing Order, P 81.

This completely disregards the core of petitioners' theory. Generators in the Midwest ISO compete across zonal boundaries. If transmission owners in one zone offer cost-based compensation for reactive power under Schedule 2, while transmission owners in another zone invoke Schedule 2-A and therefore withhold compensation for reactive power within the deadband, generators in the latter zone appear to be competitively disadvantaged.

The Commission brushed this off, saying that independent power producers can "recover" the uncompensated reactive power cost "in their market-based power sales rates." Rehearing Order, P 97.

This appears to be a complete non-answer (or is based on a misconception of rudimentary economics). It is true, of course, that if generators did not compete across zonal lines, then all generators in each zone governed by Schedule 2-A would incur an uncompensated reactive power cost and none would be competitively disadvantaged in the relevant market. But the Commission acknowledged in oral argument that

generators can and do sell real power outside their own zones. Oral Arg. Recording 17:30-19:00. Generators that follow the Commission's advice to raise their power sales rates would suffer an increased risk of being undersold by generators from zones where reactive power costs are compensated. The Commission has revealed no basis for its contention that generators in different zones are not "similarly situated" for purposes of receiving reactive power compensation. Initial Order, PP 49, 55; Rehearing Order, PP 59-60.

In its Rehearing Order the Commission observed that it had "previously noted" that "the incremental cost to the generator of reactive power within the deadband is minimal." Rehearing Order, P 96 (citing *Bonneville Power Admin*., 120 FERC ¶ 61,211, at P 21 (2007)). There is, however, no finding to that effect in this case, and no evidence in the case that would support such a finding. Indeed, the record contains one transmission owner's estimate that shifting to Schedule 2-A would reduce its reactive power costs from over $11 million to about $228,000. Affidavit of Greg M. Gudeman, October 1, 2007, at 9-10. Thus, if the Commission's glancing remark expresses an intent to rely on a *de minimis* theory, which seems doubtful, there is no evidence, much less substantial evidence, to support it.

A reader may wonder whether there may be less substance in all this than meets the eye. A generator's competitive position would seem to depend on the sum of two costs: (1) its own generating and related costs, and (2) its costs in transmitting power. Uncompensated reactive power costs would fit in (1); if compensated by the transmission owner, they would seemingly justify an increase in transmission rates, and thus fit in (2). If the generating firm's transmission costs were the charges for *its* zone, then generators who were paid by the local transmission company for reactive power would find the reactive power cost burdening them in their out-of-

zone sales just as much as it would with reactive power uncompensated. But as we explained above, all transmissions to any given customer are priced at the rate for that *customer*'s zone, so that in fact equal treatment of generators' costs of supplying reactive power is critical to giving meaning to the zonal rate system's apparent intent to assure competitive equality between generators.

Accordingly, we grant the petitions for review as to their claim that the Commission's orders violate § 205(b) of the FPA.

*Authority to file*. The petitioners complain that FERC should not have accepted the filing of Schedule 2-A as a valid tariff filing under § 205 of the FPA. Transmission owners' rights to file tariff changes under § 205 have been modified by the Settlement Agreement Between Transmission Owners and Midwest ISO On Filing Rights (the "Filing Rights Settlement"). Its § 3.9 governs tariff filings for ancillary services:

> 3.9 **Ancillary Services Other Than Schedule 1**—Both Transmission Owners that own or control generation or other resources capable of providing ancillary services (offered to customers pursuant to the [Open Access Transmission Tariff]) and the Midwest ISO shall have the right to submit filings under FPA section 205 to govern the rates, terms, and conditions applicable for the provision of ancillary services. . . . [A]ny ancillary service proposal *with regional impacts* shall be subject to the governance and coordination provisions of Sections 4 and 5 of this Settlement Agreement [requiring transmission owners to decide by a majority vote to make a joint section 205 filing and to provide at least 30 day notice].

Filing Rights Settlement, § 3.9 (emphasis added).

As § 3.9 gives filing rights to the Midwest ISO and to "Transmission Owners that own or control generation or other resources capable of providing ancillary services [including reactive power]," the petitioners argue that transmission owners may file reactive power tariffs *only* for services *they* provide.

The Commission found § 3.9 ambiguous and noted that it appeared to draw no distinction between the filing rights of "Transmission Owners that own or control generation or other resources capable of providing ancillary services" and of the Midwest ISO itself. Petitioners' proposed limitation would render the ISO's filing rights meaningless, as it provides no "ancillary services." Initial Order, P 24; Rehearing Order, PP 6-7. The Commission also noted—persuasively, in our opinion—that the reference in § 3.9 to filings with "regional impacts" would be redundant if, as the petitioners say, the Filing Rights Settlement authorized transmission owners to make only those § 205 filings that pertain to their individual rates for reactive power. *Id*. at P 8.

We find FERC's conclusion that the Filing Rights Settlement gave transmission owners the right to file Schedule 2-A to be reasonable.

\* \* \*

In sum, though we uphold the Commission's decision as to the transmission owners' right to *file* the tariff amendment creating Schedule 2-A, the Commission's approval of that change violated § 205(b)'s ban on undue discrimination and must be vacated.

*So ordered.*